NATIONAL PRIDE AT WORK, INC v GOVERNOR

Docket No. 265870. Submitted April 11, 2006, at Lansing. Decided
February 1, 2007, at 9:00 a.m. Leave to appeal sought.

National Pride at Work, Inc.; and numerous individuals who are
employees of public employers and the same-sex domestic partners of
those employees brought an action in the Ingham Circuit Court
against the Governor, seeking a declaratory judgment that Const
1963, art 1, § 25, as added by Proposal 04-2 (the amendment), does
not prohibit public employers from offering health-care benefits to
employees' same-sex domestic partners. The plaintiffs added the city
of Kalamazoo as a defendant after the city announced that it would
not extend those benefits in future contracts. The plaintiffs moved for
summary disposition. After the Attorney General submitted a motion
on the Governor's behalf seeking dismissal of the plaintiffs' claims,
the Governor obtained separate counsel and filed a brief opposing
dismissal and supporting the plaintiffs. The Attorney General then
intervened as a defendant. The court, Joyce Draganchuk, J., granted
the plaintiffs summary disposition, concluding that the amendment
does not prohibit public employers from entering into agreements to
provide domestic-partner benefits because health-care benefits are
not among the statutory rights or benefits of marriage and the
criteria for same-sex domestic-partner benefits do not approach the
legal status of marriage. Thus, the court concluded, the public
employers were not recognizing a marriage or similar union in
violation of the amendment. The Attorney General appealed.

The Court of Appeals *held*:

1. The plain language of the amendment prohibits public employ-
ers from recognizing same-sex unions for any purpose. Marriage is
recognized in Michigan as an inherently unique relationship between
a man and a woman. By officially recognizing same-sex unions
through the vehicle of domestic-partnership agreements, public em-
ployers give same-sex domestic couples a status similar to that of
married couples, thus violating the amendment, which provides that
"the union of one man and one woman in marriage shall be the only
agreement recognized as a marriage or similar union for any pur-
pose." Const 1963, art 1, § 25. Public employers are precluded from
offering the benefits at issue in this case.

2. The amendment does not conflict with the provisions of Const 1963, art 8, §§ 5 and 6. While those provisions grant a unique measure of autonomy to public universities, those universities are nonetheless bound by the public-policy mandate of Const 1963, art 1, § 25.

3. Cities are not authorized to provide same-sex benefits under MCL 117.4j of the Home Rule City Act because home-rule cities are similarly bound by the public-policy mandate of the amendment.

4. The amendment does not violate the Equal Protection Clause of the Michigan Constitution, Const 1963, art 1, § 2. The purpose of the amendment, to secure and preserve the benefits of marriage for our society and for future generations of children, is neither arbitrary nor invidious on its face. Nor does the amendment violate equal protection as applied. It is narrowly tailored to further the legitimate governmental interest in protecting and strengthening the institution of marriage.

Reversed.

CONSTITUTIONAL LAW — SAME-SEX EMPLOYMENT BENEFITS — MARRIAGE — COLLEGES AND UNIVERSITIES — MUNICIPAL CORPORATIONS — STATE.

The Michigan Constitution prohibits public employers from recognizing same-sex unions for any purpose, including the offering of employment benefits to a same-sex domestic partner of an employee through the recognition of a domestic-partnership agreement (Const 1963, art 1, § 25).

*Deborah A. Labelle, Jay D. Kaplan, Michael J. Steinberg, Kary L. Moss, Pepper Hamilton LLP* (by *Thomas P. Wilczak, Barbara Eckert Buchanan, Kurt A. Kissling,* and *Amanda J. Shelton*), *Roderick M. Hills, Jr.,* and *Nancy S. Katz* for National Pride at Work, Inc., and others.

*Susan I. Leffler* and *D. J. Pascoe,* Assistant Attorneys General, for the Governor.

*Michael A. Cox,* Attorney General, *Henry J. Boynton,* Assistant Solicitor General, and *Eric Restuccia* and *Joseph E. Potchen,* Assistant Attorneys General, for the Attorney General.

Amici Curiae:

*Stephen K. Postema,* City Attorney, for the city of Ann Arbor.

*Gloria A. Hage, Marvin Krislov, Debra A. Kowich,* and *Louis A. Lessem* for the University of Michigan Regents and the Wayne State University Board of Governors.

*Dan Sherrick* and *Georgi-Ann Bargamian* for International Union, UAW; and UAW Local 6000.

*Reach, Reach, Fink & Valvo, P.C.* (by *Cynthia L. Reach*), and *Cohl, Stoker, Toskey & McGlinchey, P.C.* (by *Peter A. Cohl*), for Washtenaw County, Ingham County, and Clinton-Eaton-Ingham Community Mental Health Board.

*Gregory, Moore, Jeakle, Heinen & Brooks, P.C.* (by *Gordon A. Gregory* and *Scott A. Brooks*), *Robert A. Sedler,* and *Ann Springer* for the Michigan Conference of the American Association of University Professors.

*Allen Brothers PLLC* (by *John M. Allen*) for Triangle Foundation, Michigan Equality, Women Lawyers Association of Michigan, and National Gay and Lesbian Task Force.

*Butzel Long* (by *Leonard M. Niehoff*) for Arab Community Center for Economic & Social Services, Fair Housing Center of Metropolitan Detroit, Patricia Klein, and Raymond Jefferson.

*Stephen M. Crampton* and *Law Office of LaRae G. Munk, PC* (by *LaRae G. Munk*), for American Family Association of Michigan.

*David & Wierenga, P.C.* (by *James R. Wierenga*), and Alliance Defense Fund (by *Benjamin W. Bull, Glen Lavy, Christopher R. Stovall,* and *Dale Schowengerdt*) for Michigan Family Forum.

Before: HOEKSTRA, P.J., and WILDER and ZAHRA, JJ.

WILDER, J. Intervening defendant Attorney General Michael Cox (AG) appeals as of right the Ingham Circuit Court's order granting summary disposition under MCR 2.116(C)(10) to plaintiffs National Pride at Work, Inc., which is a nonprofit constituency group of the AFL-CIO,[1] and various public employees and their respective same-sex domestic partners. In this appeal, the AG challenges the trial court's declaratory ruling that the marriage amendment, article 1, § 25 of the Michigan Constitution,[2] does not preclude public employers from extending benefits to domestic partners of the same sex. We reverse.

I

We begin by noting the relatively significant public attention this case has received. In that context, we feel constrained to observe at the outset that this case is not about the lifestyles or personal living decisions of individual citizens. Rather, it is about whether the marriage amendment may permissibly impose certain limitations on the state and its governmental subdivisions. More specifically, this case is about whether the marriage amendment may prohibit governmental subdivisions from entering into employment-benefit agreements that define eligibility for benefits using criteria, based on lifestyle or personal living decisions, that allegedly violate the policy choice approved in the marriage amendment.

---

[1] "AFL-CIO" stands for the American Federation of Labor and Congress of Industrial Organizations.

[2] Article 1, § 25 provides: "To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose." Const 1963, art 1, § 25.

Further, we observe that the arguments advanced in several of the amicus briefs regarding the effect of the amendment on employee recruitment, retention, and morale and marketplace competitiveness are irrelevant considerations in interpreting the constitutional amendment at issue. The vote to adopt the marriage amendment charted the policy direction for Michigan. Our decision only interprets the amendment and applies it to the particular situation presented in this case. Finally, we note that our interpretation of the language of the marriage amendment is one of first impression, insofar as it concerns a relatively unique phraseology. Thus, while other states have adopted constitutional amendments and statutes that place limitations on governmental recognition of same-sex relationships, no court in any of these states has had the occasion to interpret language approximating the language "similar union" found in Michigan's marriage amendment.[3] Consequently, guidance from the decisions of other jurisdictions is unavailing.

---

[3] For example, Kentucky's constitution states: "A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized." Ky Const, § 233a. Similarly, in 2006, Wisconsin amended its constitution to provide that "[a] legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state." Wis Const, art 13, § 13. However, neither Kentucky nor Wisconsin courts have interpreted the meaning of the language "substantially similar." We also note that Missouri has a statute providing, among other things: "A marriage between persons of the same sex will not be recognized for any purpose in this state even when valid where contracted." Mo Rev Stat 451.022(4). Florida law similarly provides: "Marriages between persons of the same sex entered into in any jurisdiction . . . or relationships between persons of the same sex which are treated as marriages in any jurisdiction . . . are not recognized for any purpose in this state." Fla Stat 741.212(1). While there are some cases interpreting these and other states' marriage amendments, the language of these amendments or statutes is not similar to the language in the Michigan marriage amendment, and, therefore, these cases are inapposite.

II

On November 2, 2004, Michigan voters approved proposal 04-2, which amended the state constitution by adding article 1, § 25 (the marriage amendment or the amendment). The amendment took effect on December 18, 2004. At the time this amendment was adopted, several public employers, including state universities and various city and county governments, had policies or agreements that extended health-care benefits to employees' same-sex domestic partners. Also, the Office of State Employer (OSE) and the United Auto Workers (UAW) Local 6000 union had previously negotiated an agreement to include same-sex domestic-partner benefits in the employment benefit packages for state-employee members of UAW Local 6000 (the state plan). Thereafter, in the midst of the public debate concerning the amendment's effect on same-sex domestic-partner benefits, the OSE and the UAW entered into a letter of intent on December 2, 2004, indicating their intent not to submit the proposed contract to the Civil Service Commission until there was a "determination by any court of competent jurisdiction that the language [of the contract] is lawful."

On March 16, 2005, the AG issued a formal opinion in response to a state representative's request for an opinion regarding the amendment's applicability to the city of Kalamazoo's ability to provide same-sex domestic-partnership benefits to its employees under existing and future contracts.[4] The AG found that the

---

[4] Eligibility for domestic-partnership benefits under the city of Kalamazoo policy required, among other things, that the individuals (1) be of the same sex, (2) be at least 18 years old and mentally competent, (3) share a common residence for at least six months, (4) be unmarried and not be related by blood closer than would prevent marriage, (5) share financial arrangements and daily living expenses, and (6) file a statement

"operative clause" of the amendment—"the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose"—is "best interpreted as prohibiting the acknowledgement of both same-sex relationships and unmarried opposite-sex relationships. More simply, the only relationship that may be given any recognition or acknowledgement of validity is the union of one man and one woman in a marriage." OAG No. 7,171 (March 16, 2005), 2005 MR 5, p 33.

National Pride at Work, Inc., together with a number of individual plaintiffs who are employees of seven different public employers and those employees' same-sex domestic partners, initiated this action seeking a declaratory judgment that the amendment does not prohibit public employers from conferring health benefits to same-sex domestic partners of employees. Plaintiffs moved for summary disposition pursuant to MCR 2.116(C)(10). Meanwhile, the city of Kalamazoo announced its plan not to extend health-care benefits to same-sex domestic partners for contracts beginning in January 2006 absent a court ruling that the benefits do not violate the amendment. Plaintiffs then added the city of Kalamazoo as a defendant.

In their amended motion for summary disposition, plaintiffs argued (1) that the plain language of the amendment does not prohibit public employers from granting same-sex domestic-partnership benefits, (2) that the amendment's proponents' assurances that the passage of the amendment would not effect benefits to same-sex partners supported such a conclusion, and (3) that if the amendment were interpreted to preclude benefits for same-sex partners, it would conflict with

of the termination of any previous domestic partnership at least six months before signing another certification of domestic partnership.

the Equal Protection Clause and the public universities' autonomy under article 8, §§ 5 and 6 of the Michigan Constitution, as well as constitute an unconstitutional bill of attainder under article 1, § 10 of the Michigan Constitution.[5]

The city of Kalamazoo agreed that whether the amendment does or does not preclude the benefits at issue was appropriately resolved by summary disposition. The AG submitted a motion on the Governor's behalf seeking dismissal of plaintiffs' claims on the basis that plaintiffs lacked standing and failed to allege an actual case or controversy or concrete harm or injury as the result of any action by the Governor. Thereafter, the Governor obtained separate counsel and filed a brief opposing dismissal and instead supporting the plaintiffs. The AG then intervened in the lawsuit, adopting as his own the brief initially filed on behalf of the Governor in support of dismissal.

The trial court granted plaintiffs summary disposition, declaring that "Const 1963, art 1, sec 25, does not prohibit public employers from entering into contractual agreements with their employees to provide domestic partner benefits or voluntarily providing domestic partner benefits as a matter of policy." The trial court determined that because "[h]ealth care benefits are not among the statutory rights or benefits of marriage," "[h]ealth care benefits for a spouse are benefits of employment, not benefits of marriage," and further concluded that the criteria for same-sex domestic-partner benefits in the employment contracts before

---

[5] Plaintiffs do not argue on appeal that a determination that the amendment prohibits public employers from granting same-sex domestic-partnership benefits constitutes an unconstitutional bill of attainder. Therefore, we consider the claim abandoned. *Etefia v Credit Technologies, Inc*, 245 Mich App 466, 471; 628 NW2d 577 (2001).

the court "do not come close to approaching the legal status that marriage holds in our society." The trial court further held:

> The Court must also give meaning to the final phrase of the amendment, "for any purpose." Intervening defendant Cox argues that this language is intended to prevent circumvention of the plain meaning of the amendment. The Court takes these words to mean what they say in the context of the entire amendment. If the employers in this case were recognizing a marriage or similar union, then they would be prohibited from doing so for any purpose. However, as discussed above, this Court cannot conclude that the employers are recognizing a marriage or similar union. On the facts of this particular case, the "for any purpose" language does not apply. Intervening defendant Cox's interpretation of this phrase would go beyond purposes of non-circumvention and would actually negate the language that preceded it.
>
> By voluntarily providing domestic partner health care benefits to an employer-defined group of people, the Plaintiffs' employers are not "recognizing a marriage or similar union." Furthermore, the health care benefits are not benefits of marriage and cannot be construed as "benefits of marriage" that are prohibited by Const 1963, art 1, sec 25. Plaintiffs' employers are not prohibited by Const 1963, art 1, sec 25, from voluntarily providing these health care benefits and using criteria which do not recognize a union similar to marriage to determine those who will receive these benefits of employment.[6]

The AG subsequently moved for a stay of the declaratory judgment, and also for an injunction to prevent (1)

---

[6] Because the motion to dismiss originally filed on behalf of the Governor was subsequently withdrawn when the Governor obtained separate counsel, the trial court concluded that plaintiffs' standing was no longer an issue. Although the AG argued in part below that plaintiffs' claims should be dismissed for lack of standing, the AG has not raised or briefed this issue on appeal. Therefore, we consider the claim abandoned. *Etefia, supra* at 471.

the Governor from submitting the state plan's revised definition of "eligible dependent" to the Civil Service Commission for possible approval and (2) the city of Kalamazoo from entering into new contracts that would confer the same health benefits on same-sex domestic partners as provided to employees' spouses. Without addressing the AG's motion for injunctive relief, the trial court denied the motion for stay.

The AG filed motions in this Court, seeking a stay and immediate consideration. This Court granted the motions for stay and immediate consideration, but declined to issue an injunctive order and instead ordered the parties to brief the question of this Court's authority and standards for the issuance of an injunction.[7] The AG now appeals the trial court's declaratory order.

III

Constitutional issues and summary disposition rulings are reviewed de novo. *Van Buren Charter Twp v Garter Belt, Inc,* 258 Mich App 594, 608-609; 673 NW2d 111 (2003). When deciding a motion for summary disposition under MCR 2.116(C)(10), a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party. *Corley v Detroit Bd of Ed,* 470 Mich 274, 278; 681 NW2d 342 (2004).

IV

A

Michigan law recognizes three rules for construing constitutional provisions. As stated by our Supreme

---

[7] *National Pride at Work, Inc v Governor,* unpublished order of the Court of Appeals, entered October 31, 2005 (Docket No. 265870).

Court in *Wayne Co v Hathcock*, 471 Mich 445, 468-469; 684 NW2d 765 (2004), the rule of common understanding constitutes the first rule of constitutional construction:

> [T]he primary objective of constitutional interpretation is to realize the intent of the people by whom and for whom the constitution was ratified.
>
> This Court typically discerns the common understanding of constitutional text by applying each term's plain meaning at the time of ratification. But if the constitution employs technical or legal terms of art, "we are to construe those words in their technical, legal sense." [Citation omitted.]

Second, "to clarify [the] meaning [of a constitutional provision, if the meaning may be questioned], the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered." *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), citing *Kearney v Bd of State Auditors*, 189 Mich 666, 673; 155 NW 510 (1915). However, if the constitutional language is clear, reliance on extrinsic evidence is inappropriate. *American Axle & Mfg, Inc v City of Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000). Under the third rule for construing a constitutional provision, "wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does." *Traverse City School Dist, supra* at 406.

B

Michigan has a long public-policy tradition of favoring the institution of marriage. *Van v Zahorik*, 460 Mich 320, 332; 597 NW2d 15 (1999). "Indeed, this public policy is deeply entrenched in our law." *Id.* at 332 n 4. In Michigan, marriage is recognized "as inherently a

unique relationship between a man and a woman . . . ." MCL 551.272. In addition, "[s]o far as its validity in law is concerned, marriage is a civil contract between a man and a woman, to which the consent of parties capable in law of contracting is essential." MCL 551.2. However, "[c]onsent alone is not enough to effectuate a legal marriage . . . . Consent shall be followed by obtaining a license . . . and solemnization . . . ." *Id.*

Plaintiffs seek to define marriage as requiring comprehensiveness and durability. But marriage is defined by statute. See MCL 551.1 *et seq.*[8] For recognition, the key components of the statutory definition are consent, MCL 551.2, and taking each other as husband and wife, MCL 551.9. MCL 551.9 provides, in relevant part: "In the solemnization of marriage, no particular form shall be required, except that the parties shall solemnly declare . . . that they take each other as husband and wife . . . ."

In reliance on the amendment's statement of purpose, "[t]o secure and preserve the benefits of marriage," plaintiffs contend that health insurance is not a benefit of marriage because health insurance is not among the statutory benefits of marriage.[9] However, the common understanding of a constitutional text is

---

[8] MCL 551.1 provides:

> Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.

[9] Examples of statutory rights that spouses accrue upon marriage include an equal interest in property of every kind acquired during the marriage, MCL 557.204; the right to hold property as tenants by the entirety, MCL 557.71; the right to pension and retirement benefits that accrue during the marriage, MCL 552.18; the right to claim an exemption

determined "by applying *each* term's plain meaning at the time of ratification." *Hathcock, supra* at 468-469 (emphasis added). Accordingly, the provision must be examined as a whole. See *id.*; see also *House Speaker v Governor*, 443 Mich 560, 579; 506 NW2d 190 (1993) (a constitutional provision must be interpreted to give reasonable effect to all, not just some, of its parts). Plaintiffs' emphasis on the statement of purpose ignores the provision's mandate: that only one "agreement"—the union of one man and one woman in marriage—may be recognized as a marriage *or similar union* for *any purpose.* The operative language of the amendment plainly precludes the extension of benefits related to an employment contract if the benefits are conditioned on or provided because of an *agreement recognized as a marriage or similar union.*[10]

Whether a public employer's extension of employment benefits, e.g., same-sex domestic-partnership benefits, is based on an *agreement recognized as a marriage or similar union,* requires this Court to discern the meanings of "recognized" and "similar union." Plaintiffs argue that to violate the amendment the state must, in effect "create" a marital union. We disagree, because creating and recognizing are not the same.

The AG contends that the term "recognize" as commonly understood means to acknowledge the existence

on taxes for spousal inheritance, MCL 205.202; joint spousal liability for certain debts, MCL 330.1804; and the right to spousal veterans' benefits, MCL 32.49d and MCL 36.31.

[10] In this regard, we reject the proposition that the amendment's mandate is ambiguous because it is written in the passive voice. The Michigan Supreme Court has held the location of provisions in article 1 of the Michigan Constitution is legally significant and contemplates limitations of governmental conduct. *Woodland v Michigan Citizens Lobby,* 423 Mich 188, 205; 378 NW2d 337 (1985) (holding that the provisions of article 1 have consistently been interpreted as limited to protection against state action).

of something. In contrast, plaintiffs contend that the term refers to the state's conferment of legal status or rights.[11] Consistently with our Supreme Court's mandate to construe technical or legal terms of art in their technical, legal sense, *Hathcock, supra* at 469, we conclude that the common understanding of the term "recognize" as used in the amendment is in a legal sense, i.e., to acknowledge the legal validity of something. See, e.g., *Detroit v Walker*, 445 Mich 682, 699; 520 NW2d 135 (1994) ("A vested right has been defined as an interest that the government is compelled to recognize and protect of which the holder could not be deprived without injustice."); see also *Mack v Detroit*, 467 Mich 186, 190; 649 NW2d 47 (2002) (rejecting the "plaintiff's invitation to recognize such a cause of action"); *Van, supra* at 332-333 (using the term "recognition" in the sense of conferring or granting legal status).

Here, in determining whether public employers' extension of same-sex domestic-partnership benefits operated to recognize a union similar to marriage, the trial court stated:

> The criteria used by the employers in the present case do not recognize "a union." There is no "union" that arises out of the employers' criteria. The criteria are no more than a collection of characteristics the employer has identified for purposes of extending health insurance benefits. Moreover, the criteria can hardly be said to recognize a union when the criteria differ by employer. Nor can the criteria be said to create a union where one does not exist

---

[11] *Random House Webster's College Dictionary* (2000) defines the term "recognize" as "to identify from knowledge of appearance of characteristics[;] . . . to perceive or acknowledge as existing, true, or valid[;] . . . to acknowledge or accept formally as being something stated[.]" Black's Law Dictionary (6th ed) defines "recognized" as "[a]ctual and publicly known."

according to law. Civil unions are not recognized in this state. Employer defined criteria for the receipt of health care benefits cannot create a union where one does not exist.

The trial court erred in ignoring the significance of the term "agreement" in the marriage amendment. Three of the four plans provided in the record[12] (those of the University of Michigan, Michigan State University, and the city of Kalamazoo), require the domestic partners to have registered, declared, signed, or filed a domestic-partnership agreement to establish entitlement to benefits. A public employer that requires proof of the existence of a formal domestic-partnership agreement to establish eligibility for benefits "recognizes" the validity of a same-sex union as reflected in the "agreement" for the "purpose" of providing the same benefits to a same-sex couple that would be provided to a married couple. This violates the plain language of the amendment prohibiting such unions from being "recognized . . . for any purpose."

Given the purpose of a domestic-partnership agreement, which is to proclaim the existence of the relationship by establishing a mechanism for the public expression, sanction, and documentation of the commitment,[13]

---

[12] The Eastern Michigan University, Wayne State University, and Eaton/Clinton/Ingham Community Mental Health Board domestic-partner benefit plans are not part of the record.

[13] The city of Ann Arbor's Declaration of Domestic Partnership includes a declaration section in which,

[p]ursuant to Chapter 110 of Title IX of the Code of the City of Ann Arbor, the undersigned hereby declare the following to be true:

1. We are in a relationship of mutual support, caring and commitment.

2. We share the common necessities of life.

we reject plaintiffs' assertion that a domestic-partnership agreement is a mere formality having no legal consequences beyond the recognition of the relationship for insurance purposes. The "public proclamation" nature of a domestic-partnership agreement grants a same-sex couple the ability to hold themselves out as a publicly recognized monogamous couple, i.e., a union.

Plaintiffs contend that for such a union to exist, the legal status of the parties to the union typically encompasses legal effects, governing hundreds of legal rights, benefits, and obligations imposed by the state and federal governments. Plaintiffs assert that, absent the conferment of the legal rights, responsibilities, and benefits triggered by marriage and given the ease in terminating a domestic partnership (unilaterally, without judicial intervention), a determination equating marriage to the extension of health insurance to same-sex partners would distort the plain meaning of "marriage." Again, we disagree.

In Michigan, marriage is recognized "as inherently a unique relationship between a man and a woman," MCL 551.272. Marriage triggers legal rights, responsibilities, and benefits not afforded to unmarried persons, pursuant to a compact that is *public* and social in nature:

> Marriage is a civil contract, but it is not a pure private contract. It is affected with a public interest and by a public

3. We are not related by blood in a manner that would bar marriage in the State of Michigan.

4. We are not married or in any other domestic partnership.

5. We are at least 18 years of age and otherwise competent to enter into a contract.

> policy. The status of children, preservation of the home, private morality, public decency, and the like afford ample grounds for special treatment of marriage as a contract, by statute and decision. In recognition of its public and social nature, courts have cast about it the protecting mantle of presumptions, sustaining validity of marriage, said to be the strongest known to the law. [*Hess v Pettigrew*, 261 Mich 618, 621; 247 NW 90 (1933).]

By officially recognizing a same-sex union through the vehicle of a domestic-partnership agreement, public employers give same-sex domestic couples status similar to that of married couples. Contrary to plaintiffs' argument, a publicly recognized domestic partnership need not mirror a marriage in every respect in order to run afoul of article 1, § 25 because the amendment plainly precludes recognition of a "similar union for any purpose."[14]

The AG argues that the state plan and the plans of the University of Michigan, Michigan State University, and the city of Kalamazoo share five attributes that are functionally the same as the requirements of legal marriage:

> (1) each requires that the partner be of the same-sex; *cf* MCL 551.1 (requires that spouse be of the opposite sex);
>
> (2) each requires there be some kind of agreement about the relationship; *cf* MCL 551.2 (marriage requires the consent of the parties);
>
> (3) each requires that the partner not be a blood relation; *cf* MCL 551.3; MCL 551.4 (listing blood relations that one cannot marry);
>
> (4) each requires that the partner not be married to another or have a similar relationship to another person; *cf* MCL 551.5 (prohibition against bigamy); and

---

[14] "Similar" means "having a likeness or resemblance, [*especially*] in a general way; having qualities in common . . . ." *Random House Webster's College Dictionary* (2000) (emphasis added).

(5) each mandates an age requirement of 18 years of age; *cf* MCL 551.51 (minimum age for marriage is 16 years of age).

We agree. All the plans listed establish criteria for eligibility that are similar to those for marriage. In addition, as we previously noted, the plans of the University of Michigan, Michigan State University, and the city of Kalamazoo also require that the employee enter into a domestic-partnership agreement in order to receive benefits. In order to be eligible for benefits under the state plan, the employee and the employee's eligible dependent must have *agreed* to be jointly responsible for basic living expenses and other common expenses of maintaining a household. Thus, while the state plan does not characterize the agreement between the employee and the dependent as a domestic-partnership agreement, its character and operation are effectively the same. Therefore, in the case of each of the plans, upon being advised of the existence of the employer-required agreement, the employer is contractually, i.e., legally, obligated to recognize the agreement for the purpose of providing health-care benefits to the dependent. In this way, the agreement between the employee and the dependent constitutes a union similar to marriage, because with the agreement (as with a marriage), the employer has a legal obligation to recognize the union and provide benefits to the eligible dependent (as with a spouse).

We reiterate that article 1, § 25 invalidates the recognition of *"union[s]"* *"similar"* to marriage *"for any purpose."* By recognizing a domestic-partnership agreement for the purpose of providing benefits, the state plan and the plans of the University of Michigan, Michigan State University, and the city of Kalamazoo run directly afoul of the plain language of the amendment.

We therefore hold that the trial court erred in declaring that "Const 1963, art 1, sec 25, does not prohibit public employers from entering into contractual agreements with their employees to provide domestic partner benefits or voluntarily providing domestic partner benefits as a matter of policy." The requirement that an employee prove the existence of either a written domestic-partnership agreement or an agreement between the employee and the dependent to be jointly responsible for basic living and household expenses, in order to establish eligibility by the partner or dependent for insurance coverage, constitutes recognition by the public employer of a "similar union for any purpose," i.e., the purpose of extending to domestic partners and dependents the benefit of insurance coverage equivalent to coverage that is extended to spouses.

Because article 1, § 25 is unambiguous and plainly precludes the recognition of same-sex domestic partnerships or similar unions for any purpose, this Court need not look to extrinsic evidence to ascertain the voters' intent. *American Axle & Mfg, supra* at 362. We therefore decline plaintiffs' invitation to consider the circumstances and public debate surrounding the adoption of the amendment.

We also reject the contention of the University of Michigan and Wayne State University as amici curiae that article 1, § 25 directly conflicts with article 8, § 5[15] of the Michigan Constitution. The Michigan Constitution confers a unique constitutional status on Michigan's public universities and their governing boards.

---

[15] Article 8, § 5 provides, in relevant part: *"Each [university] board shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds. Each board shall . . . elect a president of the institution under its supervision."* (Emphasis added.)

Const 1963, art 8, §§ 5 and 6.[16] The governing boards' status is that of " 'the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature.' " *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 460 Mich 75, 84 n 8; 594 NW2d 491 (1999) (citation omitted). But universities are not exempt from all regulation; they are subject to the Legislature's police power, as long as the regulation does not invade the university's constitutional autonomy. *Id.* at 87-88.

By the plain language of article 8, §§ 5 and 6, Michigan's public universities are autonomous only within their own spheres of authority. In *Western Michigan Univ Bd of Control v Michigan*, 455 Mich 531, 540-541; 565 NW2d 828 (1997), the Supreme Court, first noting "that the state universities are organically part of the state government," quoted approvingly from *Branum v Bd of Regents of Univ of Michigan*, 5 Mich App 134, 138-139; 145 NW2d 860 (1966), in which this Court stated:

> In spite of its independence, the board of regents remains a part of the government of the State of Michigan. . . .
>
> *       *       *
>
> . . . It is the opinion of this Court that the legislature can validly exercise its police power for the welfare of the people of this State, and a constitutional corporation such

---

[16] Article 8, section 6 provides, in relevant part: "Other institutions of higher education established by law having authority to grant baccalaureate degrees shall each be governed by a board of control which shall be a body corporate. *The board shall have general supervision of the institution and the control and direction of all expenditures from the institution's funds.* It shall . . . elect a president of the institution under its supervision." (Emphasis added.)

as the board of regents of the University of Michigan can lawfully be affected thereby. The University of Michigan is an independent branch of the government of the State of Michigan, but it is not an island. Within the confines of the operation and allocation of funds of the University, it is supreme. Without these confines, however, there is no reason to allow the regents to use their independence to thwart the clearly established public policy of the people of Michigan.

See also *Federated Publications, Inc, supra* at 87. Because the provisions in article 1 of the Michigan Constitution contemplate limitations of government conduct, *Woodland v Michigan Citizens Lobby,* 423 Mich 188, 205; 378 NW2d 337 (1985), and because the universities in question remain a part of the government of the state, *Western Michigan University Bd of Control, supra* at 540-541, Michigan's public universities are bound by the public policy mandate of the people reflected in article 1, § 25.

Moreover, every provision in our constitution must be interpreted in the light of the document as a whole, and no provision should be construed to nullify or impair another. *Lapeer Co Clerk v Lapeer Circuit Court,* 469 Mich 146, 156; 665 NW2d 452 (2003). All constitutional provisions enjoy equal dignity, and a fundamental rule of construction requires construction of every clause or section of a constitution consistently with its words, to protect and guard its purposes. *In re Proposals D & H,* 417 Mich 409, 421; 339 NW2d 848 (1983). "Words must be given their ordinary meanings . . . ." *Lapeer Co Clerk, supra* at 156. If there is a conflict between general and specific provisions in a constitution, the more specific provision must control in a case relating to its subject matter:

This second rule of construction is grounded on the premise that a specific provision must prevail with respect

to its subject matter, since it is regarded as a limitation on the general provision's grant of authority. The general provision is therefore left controlling in all cases where the specific provision does not apply. [*Advisory Opinion on Constitutionality of 1978 PA 426,* 403 Mich 631, 639-640; 272 NW2d 495 (1978).]

In the instant case, even if there were a conflict between the marriage amendment and the provisions granting universities autonomy, the marriage amendment must control because the marriage amendment governs the narrow question of whether a marriage "or similar union" will be recognized "for any purpose," whereas the grant of autonomy to the universities is general and broad.

Next, the city of Ann Arbor, as amicus curiae, argues that under its statutory authority pursuant to MCL 117.4j(3),[17] it may voluntarily provide same-sex domestic-partnership benefits. We disagree.

MCL 117.4j provides:

> Each city may in its charter provide:
>
> * * *
>
> (3) For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns subject to the constitution and general laws of this state.

" '[H]ome rule cities enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied.' " *AFSCME v Detroit,* 468 Mich 388, 410; 662 NW2d 695 (2003) (citation omitted).

---

[17] MCL 117.4j is part of the Home Rule City Act, MCL 117.1 *et seq.*

Home rule cities enjoy certain powers, *subject to* the constitution and laws of the state:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section. [Const 1963, art 7, § 22 (emphasis added).]

As a creation of the state, the city of Ann Arbor is subject to limitations imposed by the state. See *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563, 580; 609 NW2d 593 (2000) (" ' "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." ' ") (citations omitted). Thus, as is true with regard to Michigan universities, and because provisions in article 1 of the Michigan Constitution contemplate limitations of government conduct, *Woodland, supra* at 205, cities like Ann Arbor are also bound by the public policy mandate of the people reflected in article 1, § 25.

Next, plaintiffs claim that applying article 1, § 25 to prohibit them from receiving employer-provided benefits would deprive same-sex couples of the equal protection of the laws guaranteed by article 1, § 2[18] of the Michigan Constitution.[19] We disagree.

---

[18] "No person shall be denied the equal protection of the laws . . . ." Const 1963, art 1, § 2.

[19] Plaintiffs do not raise an equal protection claim under the Fourteenth Amendment of the United States Constitution.

It is a cornerstone of a democratic form of government to assume that a free people act rationally in the exercise of their power, are presumed to know what they want and to have understood the proposition submitted to them in all its implications, and by their approval vote have determined that the proposal is for the public good and expresses the free opinion of a sovereign people. *In re Proposals D & H, supra* at 423. Additionally, it is a "basic premise that in a republican form of government the 'Supreme Power resides in the body of the people.'" *Id.* at 424-425, quoting *Chisholm v Georgia*, 2 US (2 Dall) 419, 457; 1 L Ed 440 (1793). In Michigan, the people have the constitutional power to propose constitutional amendments. Const 1963, art 12, § 2 provides, in relevant part:

> Amendments may be proposed to this constitution by petition of the registered electors of this state. . . .
>
>            \*   \*   \*
>
> If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, *and shall abrogate or amend existing provisions* of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail. [Emphasis added.]

"Fundamental principles of democratic self-government preclude the judiciary from substituting its judgment for that of the people." *In re Proposals D & H, supra* at 423. Thus, the marriage amendment is to be interpreted together with the Equal Protection Clause, so that neither provision nullifies or impairs the other. *Lapeer Co Clerk, supra* at 156.

"[I]t is well established that even if a law treats a group of people differently, it will not necessarily violate the guarantee of equal protection." *Doe v Dep't of Social Services*, 439 Mich 650, 661; 487 NW2d 166 (1992). Moreover:

> "The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment. . . . Conversely, the Equal Protection Clauses do not prohibit disparate treatment with respect to individuals on account of other, presumably more genuinely differentiating, characteristics. . . . Moreover, even where the Equal Protection Clauses are implicated, they do not go so far as to prohibit the state from distinguishing between persons, but merely require that 'the distinctions that are made not be arbitrary or invidious.' " [*Heidelberg Bldg, LLC v Dep't of Treasury*, 270 Mich App 12, 17-18; 714 NW2d 664 (2006) (citations omitted).]

Interpreting the marriage amendment together with the Equal Protection Clause, so that neither is read as nullifying or impairing the other, we conclude that, consistent with the state's long public-policy tradition of favoring the institution of marriage, the marriage amendment's purpose, "[t]o secure and preserve the benefits of marriage for our society and for future generations of children," is neither arbitrary nor invidious on its face. Rather, as we have already noted, the protection of the institution of marriage is a longstanding public policy and tradition in the law of Michigan. *Van, supra* at 332; *Hess, supra* at 621-622. The people, in an act of self-government, could rationally conclude that the welfare and morals of society benefit from protecting and strengthening traditional marriages, and this act of the people constitutes a legitimate governmental interest. See also *Lawrence v Texas*, 539 US 558, 585; 123 S Ct 2472; 156 L Ed 2nd 508 (2003) (O'Connor, J., concurring). Therefore, we find that the

marriage amendment, on its face, does not violate the equal protections afforded to Michigan citizens.

We also conclude that there is no equal protection violation resulting from the marriage amendment as applied to the facts in this case. First, plaintiffs incorrectly assert that the amendment selectively targets same-sex couples for loss of protections under state law. It is undisputed that under the marriage amendment, heterosexual couples who have not married *also* may not obtain employment benefits *as a couple* on the basis of an agreement "recognized as a marriage or similar union for any purpose." Second, we reiterate that the amendment is grounded in the longstanding and legitimate governmental interest in favoring the institution of marriage. The amendment as written does not preclude the extension of employment benefits to unmarried partners on a basis unrelated to recognition of their agreed-upon relationship. In this regard, the amendment is narrowly tailored to further the legitimate governmental interest in protecting and strengthening the institution of marriage, and not to arbitrarily or invidiously exclude individuals from the protections of the laws of this state. In this regard, *Romer v Evans*, 517 US 620, 633; 116 S Ct 1620; 134 L Ed 2d 855 (1996), is distinguishable.[20]

Because the marriage amendment does not make arbitrary or invidious distinctions in furthering the legitimate governmental interests of the state, article 1,

---

[20] We similarly find plaintiffs' citation of *Alaska Civil Liberties Union v State*, 122 P3d 781 (Alas, 2005), inapposite and unpersuasive given the different law involved. First, Alaska's equal protection clause is more broadly worded, *id.* at 785, and its lowest level of equal protection scrutiny requires more than a mere rational basis, *id.* at 791. Second, the Alaska marriage amendment does not contain the language "for any purpose" or "similar union" found in Michigan's marriage amendment. See *id.* at 785-786.

§ 25 does not violate the equal protection guarantee of the Michigan Constitution. See *Heidelberg Bldg, supra* at 17-18.

V

The marriage amendment's plain language prohibits public employers from recognizing same-sex unions for any purpose. Therefore, we reverse the grant of summary disposition upholding the plan negotiated between the OSE and UAW Local 6000, and further reverse the trial court's order determining that the domestic-partnership policies of the University of Michigan, Michigan State University, and the city of Kalamazoo were not violative of article 1, § 25 of the Michigan Constitution.

Reversed. This opinion is to have immediate effect. MCR 7.215(F)(2).